**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MGF HOLDINGS, INC., )<br><br>Plaintiff-Counterdefendant, )<br><br>v. )<br><br>YOUR GIRL FRIDAY, LLC, )<br><br>Defendant-Counterplaintiff. )<br>_____ ) | Case No. 1:05-CV-01338<br>Judge Ellen Segal Huvelle |

**AMENDED COUNTERCLAIMS OF**
**DEFENDANT-COUNTERPLAINTIFF YOUR GIRL FRIDAY, LLC**

Defendant-Counterplaintiff Your Girl Friday, LLC ("YGF"), by and through its undersigned counsel, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, hereby amends its counterclaims against Plaintiff MGF Holdings, Inc. ("MGF"). YGF filed its Original Counterclaims on August 5, 2005 (Dkt. #6), but MGF has never responded to those claims (Dkt. #10). Since YGF filed its counterclaims, new information has come to light that necessitates the filing of these Amended Counterclaims.

**FACTS COMMON TO ALL COUNTS**

1.      YGF was founded in 2004 by a long-time resident of the District of Columbia. YGF provides a wide variety of services to individuals, including organizing their homes or offices; running errands for them, or otherwise completing daily chores that busy professionals have no time to complete. YGF's business is small and is confined to the District, Virginia, and Maryland. YGF does not have a website and only has run a small advertisement in the *Current* once a month since May 2004.

2.      In April 2005, YGF's business was threatened by MGF, who, without any basis in fact, claimed that it had nationwide rights to the name "MY GIRL FRIDAY," that the name "MY GIRL FRIDAY" was "trademarked," that it was operating in the District of Columbia beginning in

January 2003 (before YGF), and that, to avoid legal action, YGF should purchase a franchise from MGF.

## I.    MGF's Fraud on the Court and on YGF

3.    As it turns out, MGF's claims and this entire litigation was a charade from the start and it was orchestrated by Julie Hagenmaier, a/k/a Julie Collinsworth, a/k/a Julie Hagenmaier Collinsworth, a/k/a Julie Collinsworth Hagenmaier (hereinafter, "Ms. Hagenmaier").  MGF, through Ms. Hagenmaier, has perpetrated a fraud on this Court and on YGF by knowingly making false statements in pleadings filed with this Court and in its dealings with YGF both before and after this litigation commenced.

4.    MGF and Ms. Hagenmaier have intentionally and wrongfully used this Court as a tool for attempting to achieve business objectives, rather than as a venue in which to have legitimate grievances fairly adjudicated in a timely manner.  *See* FED. R. CIV. P. 1 (the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.").

5.    The truth, however, has caught up with MGF and Ms. Hagenmaier.  MGF is insolvent and its counsel of record has moved to withdraw (Dkt. #20) because MGF has breached a settlement agreement with YGF and has failed to pay its legal bills.  Upon information and belief, MGF vacated its offices in November 2005.

6.    Ms. Hagenmaier is the president and majority shareholder of MGF.  At all times relevant herein, Ms. Hagenmaier has controlled the day-to-day operations of MGF, has been aware of MGF's financial condition, and has used her own money to fund MGF's operations.

7.    Ms. Hagenmaier also is the principal of other companies related to MGF, including MGF Holdings, Ltd. (predecessor-in-interest to MGF), My Girl Friday, Inc., MGF Merger

Company, and My Neighbor.  MGF and these other entities all share the same office space, and Ms. Hagenmaier controls the day-to-day operations of these entities as well.

8.    As of the date of this filing, Ms. Hagenmaier is dodging service of validly issued Rule 45 subpoenas to My Girl Friday, Inc. and MGF Merger Company, two companies for whom Ms. Hagenmaier is the statutory agent.

9.    Although MGF made representations to the Court and to YGF that it was a successful business, MGF in reality was insolvent at all times relevant herein.  MGF never had the funds to prosecute its baseless lawsuit against YGF and MGF never intended to do so.  Instead, MGF impermissibly used federal court litigation as a tool to force YGF into business with MGF. For example, when Ms. Hagenmaier first contacted YGF and accused it of trademark infringement, Ms. Hagenmaier had a solution:  "It is our sincere hope that you [*i.e.*, YGF] will choose to become a 'My Girl Friday' franchisee so that we can avoid any future legal action."  MGF's counsel also threatened legal action if YGF did not agree to go into business with MGF, stating that Ms. Hagenmaier's franchise proposal was "generous."  Once this litigation commenced, MGF's counsel once again urged YGF to buy a franchise from Ms. Hagenmaier.  YGF resisted and rejected MGF's abuse of the legal process and instead filed several counterclaims against MGF.

10.    Rather than proceed with the litigation and defend against YGF's counterclaims, MGF agreed to settle this matter for $50,000.00.  But MGF never intended to abide by the terms of the settlement with YGF.  MGF used the settlement process, and months of delay and deception, to:  avoid adjudicating its rights in "MY GIRL FRIDAY," avoid an adjudication of YGF's counterclaims, prevent any opposition to its trademark application pending in the U.S. Patent and Trademark Office ("PTO"), and ultimately cause YGF to incur substantial attorneys' fees, costs, and expenses in the defense and settlement of this action.

11.     Even before this lawsuit was filed, Ms. Hagenmaier, and her agents and representatives, made false representations about "MY GIRL FRIDAY."  In an April 12, 2005 letter to YGF signed by "Julie Collinsworth Hagenmaier" as "Founder and CEO" of My Girl Friday, Inc., Ms. Hagenmaier stated that My Girl Friday, Inc.—and not MGF—owned the proprietary rights to "MY GIRL FRIDAY" and that the name "MY GIRL FRIDAY" was "trademarked."

12.     These representations were false and Ms. Hagenmaier knew that they were false when she made them.  Specifically:  in correspondence with YGF between April and June 2005, MGF's counsel stated that MGF Holdings, Ltd. and My Girl Friday, Inc.—and not MGF—owned the proprietary rights to "MY GIRL FRIDAY"; in a draft complaint submitted to counsel for McRill Services LLC d/b/a MY GAL FRIDAY, MGF's counsel alleged that "Plaintiff MGF Holdings, Ltd. is the owner of the service mark 'MY GIRL FRIDAY'"; and, MGF Holdings, Ltd. filed with the PTO the trademark application for "MY GIRL FRIDAY," and MGF Holdings, Ltd. remains the applicant as of the date of this filing.

13.     Nor, at any time relevant herein, was "MY GIRL FRIDAY" "trademarked," as alleged by Ms. Hagenmaier.  Instead, and to this date, MGF Holdings, Ltd.'s trademark application seeking federal trademark status for "MY GIRL FRIDAY" remains pending.

14.     The true facts, however, did not deter MGF or Ms. Hagenmaier from making false allegations of fact to this Court and to YGF.  On July 5, 2005, MGF filed this trademark infringement action alleging that it—and not MGF Holdings, Ltd. or My Girl Friday, Inc.—had proprietary rights in the name "MY GIRL FRIDAY" and that YGF allegedly infringed those rights. MGF alleged, among other things, that MGF was doing business in "64 . . . markets" and was an "extremely successful business" that had "extensive[ly] promot[ed]" itself.  Compl., ¶¶ 9, 10, 11. MGF further alleged that it had "expanded" into "the Washington, D.C. metropolitan area."  Id., ¶

9. As president and majority shareholder of MGF, Ms. Hagenmaier reviewed and approved these allegations.

15.     Statements made to the press and in promotional material provided to YGF by Ms. Hagenmaier similarly painted the "MY GIRL FRIDAY" business as booming. In a December 6, 2002 article in the *Cincinnati Business Courier*, Ms. Hagenmaier stated that she "ha[s] deals that are worth $10 million, $20 million and $40 million on the table." In promotional material provided to YGF, Ms. Hagenmaier stated that "the *My Girl Friday* brand is quickly becoming the leader in this emerging [national concierge service] industry" and that "*My Girl Friday* is at the leading edge of a major growth industry."

16.     On August 3, 2005, MGF's counsel wrote to YGF and offered YGF "an opportunity to become a franchisee on favorable terms." The letter continued that, "as the litigation continues," MGF may change its mind. "I would strongly encourage you to consider this option," MGF's counsel said, because "becoming part of [MGF's] growing network of franchisee's [*sic*] offers considerable benefits." (Emphasis added.) Ms. Hagenmaier reviewed and approved the representations made in the August 3 letter.

17.     The allegations in the Complaint and the statements to the press, in the promotional material, and in the August 3 letter were false when made and MGF and Ms. Hagenmaier knew it. Based on audited financial statements of MGF Holdings, Ltd. (MGF's predecessor-in-interest) dated July 5, 2005—the same date that MGF filed this lawsuit —MGF Holdings, Ltd. had:  a mere $5,011 in cash; a net operating loss of $14,197; $0 in accounts receivables; $0 in sales; spent a paltry $2,710 in advertising for the six-month period June 15, 2004 to December 31, 2004; and, a whopping $275,225 in accounts payables. And, upon information and belief, MGF vacated its Cincinnati office in November 2005.

18.     Thus, contrary to the representations made in MGF's August 3 letter, there was no "growing network of franchisee[s]" at all.  MGF Holdings, Ltd.'s books showed that, as of December 31, 2004, not even a single franchisee had been sold because MGF Holdings, Ltd. had $0 in sales.  In fact, MGF Holdings, Ltd. has sold only one franchise, and that franchise appears to have failed as well.

19.     MGF's own counsel has confirmed that MGF is now, and has been during all times relevant herein, a failed business with no funds to prosecute this case or to pay the $50,000.00 settlement to which it had agreed.  Specifically, MGF's counsel has moved to withdraw from this litigation (Dkt. #20) because, among other reasons, MGF has failed to pay its legal bills, which were first due on June 1, 2005—one month before MGF filed this lawsuit.

20.     Without any knowledge of MGF's true financial condition, YGF began to defend itself vigorously in this litigation.  YGF answered MGF's frivolous complaint and asserted several counterclaims against MGF based on information available in the public domain.  Dkt. #6.  MGF then used alleged "good faith" settlement negotiations to avoid several deadlines imposed by the Court and the Federal Rules of Civil Procedure and to conceal the fact that its business had failed.

21.     For example, on August 11, 2005, YGF served a third-party document subpoena on two of MGF's affiliated entities:  MGF Merger Company and My Girl Friday, Inc.  Ms. Hagenmaier is listed in the records of the Ohio Secretary of State as the statutory agent for these two entities.  These entities also were represented by MGF's counsel of record.  The document subpoenas had a return date of August 25, 2005, and they requested information critical to YGF's defense and to its Original Counterclaims.

22.     Shortly before MGF's affiliated entities were required to produce these important documents to YGF, MGF's counsel sought an adjournment of the response date because the parties' efforts were best spent trying to reach a settlement.  Based on this representation, YGF

agreed to adjourn the return date associated with the document subpoenas to facilitate good faith settlement efforts.

23.    In addition, with the deadline for replying to YGF's counterclaims fast approaching, MGF sought YGF's consent to agree to a one-week extension of time to file its reply to continue settlement discussions.  YGF agreed, and, on August 23, 2005, MGF represented to the Court that, inter alia:  "The parties have agreed to a one-week extension of time for [MGF] to reply to [YGF's] Counterclaims <u>for the purpose of facilitating good faith settlement efforts</u>."  Dkt. #10, ¶ 5 (emphasis added).  The next day, August 24, 2005, the Parties filed their Joint Report and Proposed Scheduling Orders.  Dkt. #11.  In that Joint Report, MGF once again stated its purported desire to settle this dispute, and repeatedly assured the Court that it sought a "prompt" resolution of the matter through "settlement."  <u>Id.</u> at 1, 9, 10.

24.    The parties reached a settlement on August 29, 2005, and MGF agreed, among other things, to pay YGF $50,000.00.  To save MGF the expense of travel to Washington, D.C. and of attorneys' fees in connection with the August 31st Initial Scheduling Conference set by the Court, YGF agreed to adjourn the Conference, informing the Court that "the parties reached a settlement in principle of this entire dispute."  Dkt. #12, ¶ 1.  As part of the settlement, the parties advised the Court that they "intend[ed] to <u>jointly draft as soon as possible</u>" two documents:  "an interim letter agreement" and a "subsequent formal settlement agreement."  <u>Id.,</u> ¶ 2 (emphasis added).

25.    YGF consented to the motion to adjourn only because MGF agreed to enter into an "interim letter agreement" that would memorialize the material terms of the settlement.  Thus, the Parties advised the Court that:  "Given these developments, the parties agree that an initial scheduling conference is, at this time, unnecessary, and <u>their resources would be better spent drafting and negotiating the final settlement agreement</u>."  Dkt. #12, ¶ 3 (emphasis added).  Based on these representations, the Court issued an Order on August 30, 2005 dismissing the case without

prejudice and allowing the parties 45 days to consummate the settlement. Dkt. #13. The 45-day period was set to expire on Friday, October 14, 2005. Unbeknownst to YGF, MGF and Ms. Hagenmaier never intended to, and ultimately did not, comply with the Court's Order.

26.    On September 9, 2005, the parties executed the agreed-to letter agreement, which memorialized MGF's agreement to pay YGF $50,000.00. Counsel for YGF and MGF executed the agreement on behalf of their respective clients.

27.    On its face, the letter agreement stated that the parties "intended" the Agreement to be "binding" and "enforceable." The purpose of the letter agreement was to ensure that all parties were bound and that no party could walk away from the agreed-to settlement without being in breach of the letter agreement.

28.    The letter agreement imposed on the parties certain time-sensitive obligations that had to be fulfilled to comply with the 45-day settlement period prescribed by the Court's August 30 Order. Paragraph 5 of the letter agreement was one such provision, and it stated:

> Subject to MGF's approval, and prior to the execution of a formal settlement agreement, YGF shall select an alternative name for conducting its business. MGF shall not unreasonably withhold approval of any alternative name that does not use the words "GIRL" or "FRIDAY" or is not otherwise confusingly similar to MY GIRL FRIDAY.

29.    On September 20, YGF submitted to Richard S. Schurin ("Mr. Schurin"), MGF's counsel of record, two alternative business names for MGF's approval. YGF sought MGF's approval of the proffered alternative business names so that YGF could circulate a draft of a formal settlement agreement during the week of September 19, 2005.

30.    After sending its September 20th correspondence to Mr. Schurin, YGF repeatedly attempted to contact Mr. Schurin to discuss the status of the settlement process. Mr. Schurin finally contacted YGF on September 26, but informed YGF that he no longer represented MGF. Mr. Schurin later qualified his statement, saying that "it was [his] understanding that [MGF's] corporate counsel would be contacting [YGF] in response to [YGF's] prior inquiry about the new choice of

[business] name." Mr. Schurin did not indicate what role, if any, he would assume in the settlement process going forward. MGF's "corporate counsel" was J. Timothy Riker ("Mr. Riker"), but he never contacted YGF about any matter related to the settlement or the litigation. At all times relevant herein, Mr. Schurin was acting at the direction, and on behalf of, MGF and Ms. Hagenmaier.

31.    MGF and its counsel at all times knew that the settlement in this case must be "consummated" within the Court-ordered 45-day period to avoid a dismissal with prejudice of YGF's counterclaims, yet MGF intentionally and in bad faith failed to inform YGF that a change in counsel had occurred or that different counsel were handling different aspects of the parties' settlement.

32.    Worse still, after YGF initiated contact with counsel that apparently was in charge of settling this matter (Mr. Riker), he too gave YGF the run-around. For example, when YGF first spoke to Mr. Riker on September 27, 2005, he was not even aware of the Court's Order establishing a 45-day period to consummate a settlement of this matter. Mr. Riker also indicated that an MGF Board meeting supposedly was upcoming and that he would contact YGF thereafter to discuss the settlement. He never did. At all times relevant herein, Mr. Riker was acting at the direction, and on behalf of, MGF and Ms. Hagenmaier.

33.    YGF again contacted Mr. Riker on October 4, 2005 to inquire about MGF's previous Board meeting and whether MGF intended to comply with the terms of the "binding" and "enforceable" letter agreement. Unfortunately, Mr. Riker not only declined to assure YGF that MGF intended to fulfill its obligations under the letter agreement, but he informed YGF that MGF's Board was having yet another meeting (this time on Friday, October 7), and that either he or Mr. Schurin would contact YGF after that Board meeting to discuss the settlement. Having heard enough, YGF set a deadline of Tuesday, October 11, 2005 for MGF to comply with the terms of the

letter agreement, otherwise YGF would move to re-open the case, as allowed by the Court's August 30 Order.

34.    At the eleventh hour, and after YGF had prepared a motion to re-open this matter, Mr. Schurin re-appeared as MGF's counsel.  In the afternoon of Monday, October 10 (Columbus Day), Mr. Schurin—not Mr. Riker, who YGF was told was in charge of this aspect of the settlement—approved the alternative business names that YGF proposed twenty days earlier.  Mr. Schurin further stated that, to "expedite matters," he wanted YGF to circulate a draft of the formal settlement agreement, which YGF did the very next day.  The parties also agreed to jointly ask the Court to extend the settlement period by another 14 days (or until October 28, 2005) and to "in good faith work to obtain a fully executed formal settlement agreement and payment of the first $25,000.00 by October 27, 2005."  (Emphasis added.)

35.    After repeated attempts to obtain MGF's comments on the draft formal agreement, Mr. Schurin finally responded ten days later, after the close of business on Friday, October 21, 2005.  Yet, MGF's proposed revisions were not even complete because "[MGF] may still have more changes since [Ms. Hagenmaier] is waiting to hear back from her corporate counsel [Mr. Riker]."  YGF responded to MGF's proposed changes the next day.

36.    At no time between August 29, 2005 and October 24, 2005 did Mr. Schurin or any other representative of MGF state, or even suggest, that MGF was unable to pay the agreed-to settlement of $50,000.00.  To the contrary, YGF was repeatedly told by MGF's counsel that MGF had a solid business that was doing well.

37.    On October 25, 2005—almost *two months* after the parties informed the Court that a settlement had been reached and *46 days* after MGF agreed to the principal terms of the settlement—MGF informed YGF for the first time that it could not pay any portion of the

$50,000.00 settlement amount.  Instead, MGF offered YGF $1,000.00.  MGF agreed that it was in breach of the letter agreement.

38.    Having breached the letter agreement, MGF proposed various solutions to its dilemma, and they all required that YGF enter into some undefined business relationship through which MGF would pay YGF over a period of years.  But, as it turns out, even these proposals were bogus because MGF vacated its offices in November 2005 and has no business with whom YGF could form a relationship.

39.    In any event, MGF and Ms. Hagenmaier came full circle.  Before, and shortly after, initiating this litigation, MGF and Ms. Hagenmaier used federal court litigation to force YGF to become an MGF franchisee.  Now, MGF and Ms. Hagenmaier wanted YGF to go into business with MGF to avoid liability for breach of the letter agreement.

40.    YGF rejected all of these absurd proposals for the obvious reason that a business venture with a failed business is no remedy for MGF's and Ms. Hagenmaier's breach of the letter agreement and wrongful conduct.  On November 4, November 10, and December 7, YGF inquired as to MGF's efforts to come up with the funds necessary to consummate the settlement.  MGF did not respond to the first two inquires at all.  When MGF finally responded to YGF's December 7 inquiry, it was plain that it had made no such efforts.

41.    At all times relevant herein, MGF and Ms. Hagenmaier, through their agents and representatives, intentionally disguised the true facts as to the financial condition of MGF by representing to the Court that it intended to settle this matter and by representing to YGF that it had the resources to pay the $50,000.00 settlement.  These representations were false and MGF and Ms. Hagenmaier knew that they were false when they made them.  MGF never had the funds to comply with the terms of the letter agreement and never intended to do so.  As the president and

majority shareholder of MGF, Ms. Hagenmaier was fully aware that MGF was insolvent, and she intentionally concealed that fact from the Court and from YGF.

42.     MGF and Ms. Hagenmaier have abused the processes of this Court.  MGF and Ms. Hagenmaier used the privileged medium of a lawsuit to force YGF into business with them.  Having failed to so coerce YGF, MGF and Ms. Hagenmaier then used the Court's August 30 dismissal without prejudice to extend these proceedings for months, refuse to consummate the agreed-to settlement, and then finally disclose—weeks later—that it was insolvent and "judgment proof."

43.     YGF has suffered significant damage as a result of MGF's and Ms. Hagenmaier's wrongful conduct in the form of attorneys' fees, costs, expenses, lost profits, and other damages to be proven at trial.

## II.    The Ubiquity of "Girl Friday"—MGF Never has had Enforceable Rights in "MY GIRL FRIDAY"

44.     In addition to intentionally concealing MGF's dire financial condition and misleading the Court and YGF into believing that it intended to settle this matter, MGF and Ms. Hagenmaier knew, or in the exercise of reasonable diligence should have known, that neither MGF nor any of its affiliated entities had any enforceable rights in "MY GIRL FRIDAY."  In fact, a brief surf of the Internet, rudimentary knowledge of Ms. Hagenmaier's public statements, and MGF's trademark application with the PTO would have revealed this obvious conclusion.

45.     "At last he lays his head flat upon the ground, close to my foot, and sets my other foot upon his head, as he had done before; and after this made all the signs to me of subjection, servitude, and submission imaginable, to let me know how he would serve me so long as he lived.  I understood him in many things, and let him know I was very well pleased with him.  In a little time I began to speak to him; and teach him to speak to me: and first, I let him know his name should be Friday, which was the day I saved his life . . . .  [F]or never man had a more faithful, loving, sincere servant than Friday was to me; without passions, sullenness, or designs, perfectly obliged and

engaged; his very affections were tied to me, like those of a child to a father . . . .  And now my life

began to be so easy . . . ."

46.    And thus, "Man Friday" was born—the all-purpose personal assistant to Robinson

Crusoe, the shipwrecked protagonist after which Daniel Defoe's classic 1719 novel was named.  In

the almost 300 years since the publication of *Robinson Crusoe*, Defoe's "Man Friday" has become

woven into the fabric of the English language and has spawned its gender counterpart—"Girl

Friday."

47.    Ms. Hagenmaier has stated publicly that she did not come up with the name "Girl

Friday."  Instead, she "met with a woman who [wa]s in her 80s" and that was a counselor and

mentor at the Service Corps of Retired Executives.  That woman's name is Ruth van Gelder-

Bochner.  According to an article posted on http://www.score.org, "Ruth . . . coined the company's

name . . . ."

48.    "Girl Friday" is a noun.  "My Girl Friday" is a noun phrase.  "Girl Friday" is defined

in the dictionary as a "female assistant (as in an office) entrusted with a wide variety of tasks."  "Girl

Friday" also is a common idiom defined as "[a]n efficient and faithful female assistant, as in *I'll have

my girl Friday get the papers together*."

49.    Inserting the possessive pronoun "My" before "Girl Friday" does not produce a

term that's defined any differently than the dictionary defines "Girl Friday."  Ms. Hagenmaier has

used "Girl Friday" and "My Girl Friday" interchangeably to mean the same thing.  For example, Ms.

Hagenmaier has stated publicly that:  "My Girl Friday is a personal concierge service.  We run

errands for people, . . . take your cat to the vet, do your grocery shopping, take your car in for an oil

change, anything that you don't have time to do."  The opening page of egirlfriday.com states in part

that "MY GIRL FRIDAY" encompasses the "true concept of the personal assistant" because:  "A

Girl Friday will do your laundry, pick up your groceries and prep your dinner all while waiting for

the cable guy or your furniture to be delivered. Picking up your dry-cleaning, taking your car in for an oil change or the cat to the vet are all requests that make your life easier."

50.     My Girl Friday, Inc. sponsors the website http://www.egirlfriday.com. Through Ms. Hagenmaier's public statements and MGF Holdings, Ltd.'s and My Girl Friday Inc.'s promotional material, members of the public are directed to the egirlfriday.com website for information about the services allegedly offered under the purported mark "MY GIRL FRIDAY." The design of the egirlfriday.com website, and the presentation of the purported mark "MY GIRL FRIDAY" on that website, has changed many times since the year 2000.

51.     The egirlfriday.com website confirms that the purported mark "MY GIRL FRIDAY" denotes services performed by a "Girl Friday."

52.     Ms. Hagenmaier's public statements confirm that the purported mark "MY GIRL FRIDAY" denotes services performed by a "Girl Friday." For example, Ms. Hagenmaier has stated publicly that: "[W]e're hoping that people understand that we're problem-solvers. You tell us what your problem is, and we can solve it for you. And that's what we're hoping that, you know, you can ask us whatever you want, home, work, life, whatever, and we can solve it for you, because that's what a Girl Friday can do. She's a well-rounded individual who can take care of you." Ms Hagenmaier also has stated publicly that "most" of the services offered under the purported mark "MY GIRL FRIDAY" are "not rocket science."

53.     The term "Girl Friday" was made popular in the 1940 romantic comedy *His Girl Friday*, starring Cary Grant and Rosalind Russell. *His Girl Friday* has been rated by *Time Magazine* as one of the top 100 movies of all time. The film is listed on the Internet Movie Database's list of top 250 films, was #19 on the American Film Institute's "100 Years, 100 Laughs," and has been selected for preservation in the United States National Film Registry.

54.    Ms. Hagenmaier has stated publicly that "GIRL FRIDAY" is "a term from the [19]40s that really we've taken and just brought…up-to-date."

55.    State and federal courts have used the term "Girl Friday" in written opinions to refer to persons who perform services identical, or substantially similar, to the services allegedly offered by MGF under the purported mark "MY GIRL FRIDAY."

56.    The term "Girl Friday" is used in newspapers and magazines to refer to persons that perform services identical, or substantially similar, to the services allegedly offered by MGF under the purported mark "MY GIRL FRIDAY."

57.    Scores of businesses throughout the United States use "Girl Friday" in their business name and offer services that are identical, or substantially similar, to the services allegedly offered by MGF under the purported mark "MY GIRL FRIDAY."

58.    Businesses in Plaintiff's home state of Ohio are no exception.  For example, Joann Gill of Lima, Ohio registered the business "MY GIRL FRIDAY" with the Ohio Secretary of State on or about February 14, 1989.  Ms. Gill stated in her filings with the Secretary of State that the general nature of the "MY GIRL FRIDAY" business was "Office Services, Wedding Invitations & Planning, Miscellaneous Errands."  Upon information and belief, Ms. Gill used "MY GIRL FRIDAY," and provided the "MY GIRL FRIDAY" services described in her filings with the Ohio Secretary of State, until on or about February 28, 1994.

59.    When Ms. Hagenmaier first attempted to register "MY GIRL FRIDAY" in Ohio, the Ohio Secretary of State prohibited her from doing so.  Prior to February 2000, Collinsworth Enterprises, Inc., a company formed by Ms. Hagenmaier (then named Julie Collinsworth), filed a Trade Name Registration form with the Ohio Secretary of State, seeking to register "MY GIRL FRIDAY."  Collinsworth Enterprises stated in the Trade Name Registration form that the nature of the business conducted under the proposed trade name "MY GIRL FRIDAY" was:  "of a [*sic*]

business & personal services.  We teach computer classes, provide maid service & act as a personal assistent [*sic*] when needed."

60.    By letter dated February 2, 2000, the Ohio Secretary of State rejected Collinsworth Enterprises' attempt to register "MY GIRL FRIDAY" as a trade name.  In that letter, the Ohio Secretary of State stated in part:  "The proposed corporate name is not available.  We have on file #RN207770, GIRL FRIDAY.  To obtain consent for the use of this name contact:  DORIS J. VAN LUIT, 4115 MYRTLE AVE, CINCINNATI, OHIO 45236."

61.    Collinsworth Enterprises obtained Ms. Van Luit's consent to use "MY GIRL FRIDAY" on or about February 11, 2000 by executing a form titled "CONSENT FOR USE OF SIMILAR NAME."

62.    As recently as June 2005, three individuals formed a general partnership in Columbus, Ohio, and filed a Name Registration form with the Ohio Secretary of State seeking to register the trade name "GIRL FRIDAY."  According to the filing, the nature of the business conducted under the trade name "GIRL FRIDAY" is "Personal Assistant."  The Ohio Secretary of State approved the trade name and registered it on or about June 17, 2005, Registration No. 1551043.  MGF has never contacted the owner's of Ohio's "GIRL FRIDAY" and threatened legal action for trademark infringement.

### III.    The PTO Required a Disclaimer of "GIRL FRIDAY"

63.    "MY GIRL FRIDAY" is not a federally registered trademark, contrary to Ms. Hagenmaier's representation to YGF that "MY GIRL FRIDAY" was "trademarked."  On or about May 10, 2004, MGF Holdings, Ltd. filed a trademark application with the PTO, Serial No. 78415742, seeking to register "MY GIRL FRIDAY" as a trademark pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*  The PTO has not published that application for opposition, and it remains pending as of the date of this filing.

64.    Ms. Hagenmaier, through her agents and representatives, has provided the PTO and the State of Ohio different dates on which "MY GIRL FRIDAY" was first used in commerce. In its May 2004 application to the PTO, MGF Holdings, Ltd., predecessor-in-interest to MGF, stated that "MY GIRL FRIDAY" was "first use[d]" "anywhere" or "in commerce" on July 22, 2002. However, in a subsequent filing with the PTO, MGF Holdings, Ltd. stated that the date of first use was November 15, 1999. Yet, in its most recent filing with the Ohio Secretary of State (August 15, 2005), My Girl Friday, Inc. filed a trade name registration for "MY GIRL FRIDAY" and listed the "Date of First Use" as August 1, 2002.

65.    In connection with MGF Holdings, Ltd.'s application, the PTO stated in part: "Applicant must insert a disclaimer of 'GIRL FRIDAY' in the application because the applicant's services are those that are regularly provided by a girl Friday. See attached dictionary definitions of 'girl Friday.'" The PTO stated further that "[t]he following is the accepted standard format for a disclaimer: No claim is made to the exclusive right to use 'GIRL FRIDAY' apart from the mark as shown."

66.    MGF Holdings, Ltd.'s counsel at that time agreed that a disclaimer was required. MGF Holdings, Ltd.'s counsel at that time agreed to the PTO's proposed language for the disclaimer.

67.    MGF Holdings, Ltd.'s trademark application contains the following disclaimer: "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'GIRL FRIDAY' APART FROM THE MARK AS SHOWN."

68.    On or about March 14, 2005, MGF Holdings, Ltd.'s current counsel asked the PTO to remove the disclaimer. The PTO has refused to remove the disclaimer as of the date of this filing.

17

69.    MGF Holdings, Ltd. has not informed the PTO that MGF and/or My Girl Friday, Inc. are owners of the purported mark "MY GIRL FRIDAY."

IV.    **The "Public's" So-Called "Knowledge" of "MY GIRL FRIDAY" is Nonexistent**

70.    The purported mark "MY GIRL FRIDAY" has been owned by several entities over the past five years that are controlled by Ms. Hagenmaier.

71.    The services that MGF, MGF Holdings, Ltd., and My Girl Friday, Inc. allegedly offer under the purported mark "MY GIRL FRIDAY" have materially changed over time. According to egirlfriday.com, "[t]he [MY GIRL FRIDAY] business was originally created to work with busy professionals in their home environment." Then, according to egirlfriday.com, "[t]hrough exposure from the Greater Cincinnati Chamber of Commerce, corporations began approaching [Ms. Hagenmaier] about integrating My Girl Friday's services with their current employee benefits."

72.    Now, according to Ms. Hagenmaier, the "MY GIRL FRIDAY" business is focused on franchising. Ms. Hagenmaier has stated publicly: "So we had new branding, new website, new— we had research done on our old brand, saying that it wouldn't do well in this market segment, so we had to completely revamp our whole look and feel in order to make it franchise friendly." And, the most recent version of egirlfriday.com states: "My Girl Friday, Inc. is a concierge company designed for individuals who travel and need help in their home environment or at their destination location while on the road. . . . A Girl Friday has the ability to go into a client's personal life and home environment to help where travelers are experiencing the most stress."

73.    Consumers within the District of Columbia do not recognize the purported mark "MY GIRL FRIDAY." Consumers outside of the District of Columbia do not recognize the purported mark "MY GIRL FRIDAY."

74.    Consumers within the District of Columbia do not associate the purported mark "MY GIRL FRIDAY" with MGF, MGF Holdings Ltd., or My Girl Friday, Inc. Consumers outside

of the District of Columbia do not associate the purported mark "MY GIRL FRIDAY" with MGF, MGF Holdings Ltd., or My Girl Friday, Inc.

75.     Consumers within the District of Columbia do not associate the purported mark "MY GIRL FRIDAY" with the alleged services of MGF, MGF Holdings Ltd., or My Girl Friday, Inc.  Consumers outside of the District of Columbia do not associate the purported mark "MY GIRL FRIDAY" with the alleged services of MGF, MGF Holdings Ltd., or My Girl Friday, Inc.

76.     MGF does not have standing to claim any rights in "MY GIRL FRIDAY."  After Collinsworth Enterprises obtained consent from Ms. Van Luit to use the name "MY GIRL FRIDAY" on February 11, 2000, the Ohio Secretary of State registered "MY GIRL FRIDAY" as a trade name, Registration No. 1136873, on or about February 22, 2000.  The "Expiration Date" for the trade name "MY GIRL FRIDAY" was set for February 22, 2005.

77.     On or about July 25, 2002, Ms. Hagenmaier filed with the Ohio Secretary of State a Certificate of Amendment by Shareholders or Members, seeking to amend Collinsworth Enterprises' articles of incorporation and to change the name of Collinsworth Enterprises, Inc. to "My Girl Friday, Inc."

78.     On or about August 7, 2002, Collinsworth Enterprises filed with the Ohio Secretary of State a form titled "CONSENT FOR USE OF SIMILAR NAME" authorizing My Girl Friday, Inc. to use the name "MY GIRL FRIDAY."  On or about August 9, 2002, the Ohio Secretary of State acknowledged My Girl Friday, Inc. as an Ohio corporation, Charter No. 911799.

79.     On or about January 17, 2003, Ms. Hagenmaier, on behalf of My Girl Friday, Inc., filed a Name Registration form with the Ohio Secretary of State, seeking to register the name "MY NEIGHBOR," a business that offers "Concierge Services."  The Ohio Secretary of State registered "MY NEIGHBOR" on or about January 21, 2003, Registration No. 1363463.  According to

information readily available in the public domain, MY NEIGHBOR offers the same services that MGF allegedly provides under the mark "MY GIRL FRIDAY."

80.    On or about March 24, 2004, MGF Holdings Ltd. was registered as a limited liability company with the Ohio Secretary of State, Registration No. 1451748.  Ms. Hagenmaier was appointed statutory agent for MGF Holdings, Ltd. on or about March 17, 2004, listing her address as 1776 Mentor Avenue, Cincinnati, Ohio 45212.

81.    Neither MGF Holdings, Ltd. nor My Girl Friday, Inc. filed with the Ohio Secretary of State the form titled "CONSENT FOR USE OF SIMILAR NAME" authorizing MGF Holdings, Ltd. to use the name "MY GIRL FRIDAY."  In fact, on August 15, 2005, My Girl Friday, Inc.—not MGF or MGF Holdings, Ltd.—filed a trade name registration with the Ohio Secretary of State seeking to register the name "MY GIRL FRIDAY."

82.    Form 555 is issued by the Ohio Secretary of State.  That form is titled "Trade Mark/Service Mark Application."  Form 555 permits any corporation, whether domestic or foreign, to register a trade mark or a service mark with the Ohio Secretary of State.  The fee for such a filing is $125.00.  An applicant may expedite the processing of its Form 555 by checking a box in the upper right-hand corner of the form and paying an additional $100.00 fee.

83.    Form 555 requires an applicant to certify, for example, that:

(a)    "The applicant is the owner of the trade mark/service mark and no other person has the right to use the mark in the State of Ohio either in the identical form or in such near resemblance as might be calculated to deceive or be mistaken for it."

(b)    "No other person has a registration of the same or of a confusingly similar trade mark/service mark in the United States Patent Office for the same or similar goods."

(c)    The applicant is or is not "the owner of a concurrent registration in the United States Patent Office of this trade mark/service mark covering an area including this State."

20

84.     On Form 555, services are grouped into certain classes.  Class 45 includes, in part: "Personal and social services rendered by others to meet the needs of individuals . . . ."

85.     Prior to initiating this litigation, neither MGF, MGF Holdings Ltd., nor My Girl Friday, Inc. filed a Form 555 with the Ohio Secretary of State seeking to register "MY GIRL FRIDAY."  Instead, neither Collinsworth Enterprises nor My Girl Friday, Inc. paid the required $25.00 fee to renew registration of "MY GIRL FRIDAY" with the Ohio Secretary of State.  By operation of Ohio law, the Ohio Secretary of State canceled the trade name "MY GIRL FRIDAY" on or about February 22, 2005.  As a result, the Ohio Secretary of State in June 2005 permitted the registration of a new entity named "GIRL FRIDAY" that offers personal assistant services in the Columbus, Ohio area.  On August 15, 2005—after YGF alleged in its Original Counterclaims that the Ohio Secretary of State canceled the trade name "MY GIRL FRIDAY"—My Girl Friday, Inc. (and not MGF) then re-registered "MY GIRL FRIDAY" as a trade name.

86.     Neither MGF nor the purported mark "MY GIRL FRIDAY" have expanded into 64 markets in the United States, as alleged in MGF's Complaint.  Ms. Hagenmaier has publicly stated that providers of Girl Friday services in the alleged 64 markets are not building the "MY GIRL FRIDAY" brand or building the "MY GIRL FRIDAY" business.

87.     Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised on the website of the National Association of Professional Organizers, http://www.napo.net.

88.     MGF has adopted a franchise model for conducting its business using the purported mark "MY GIRL FRIDAY."  On or about July 20, 2004, MGF Holdings Ltd. began offering franchises in some states.  MGF has not advertised a "MY GIRL FRIDAY" franchise offering in the District of Columbia.

89.     According to the contents of <u>egirlfriday.com</u> as of the date of this filing, "MY GIRL FRIDAY" franchises are not offered in Maryland or Virginia.

90.     Ms. Hagenmaier stated publicly that her "conservative goal[]" was to sell 7-12 franchises using the purported "MY GIRL FRIDAY" mark before July 20, 2005.

91.     Ms. Hagenmaier also has stated publicly that selling one franchise using the purported "MY GIRL FRIDAY" mark "within 150 days from that July 20th date [*i.e.*, on or about December 18, 2004]" would make her "feel confident" that the franchise model was "successful."

92.     Ms. Hagenmaier has said publicly that "it's important for me to sell the first franchise, and then it's also important for me to make sure that those first couple of franchises, you know, they get my attention so that they can do well.  Now I can't guarantee they're going to do well, obviously, but, you know, I have to work with them closely, because it's such a new concept, and we know that industry experts are watching to see how this works."

93.     According to an article posted on the <u>egirlfriday.com</u> website, MGF Holdings, Ltd. sold only 1 franchise using the purported "MY GIRL FRIDAY" mark as of the end of April 2005. That franchise was limited to the "western territory of Las Vegas."  No company by the name of "MY GIRL FRIDAY" is registered to do business in the state of Nevada.  No company by the name of "MY GIRL FRIDAY" has a listed address and phone number in Las Vegas, Nevada that is available on the Internet.  That franchise thus appears to have failed as soon as it began.

94.     MGF Holdings, Ltd.'s failure to sell more franchises is due to its failure to have proprietary rights in the purported mark "MY GIRL FRIDAY" and due to its insolvency.

**V.     "MY GIRL FRIDAY" and the District of Columbia—No Connection Whatsoever**

95.     As previously alleged (¶ 1), YGF is a small business run by a long-time resident of the District of Columbia.

96.     In March 2004, YGF registered to do business in the District of Columbia under the name "YOUR GIRL FRIDAY, LLC." On March 16, 2004, the District of Columbia's Department of Consumer and Regulatory Affairs issued a Certificate of Organization to YGF. On March 23, 2004, YGF received its federal employer identification number. On March 29, 2004, YGF received its Notice of Business Tax Registration from the District of Columbia.

97.     Prior to registering in the District of Columbia, YGF caused to be performed a search of District of Columbia public records to determine whether any other entity in the District of Columbia was doing business, or was otherwise using the name, "GIRL FRIDAY." The search was conducted by the District of Columbia's Department of Consumer and Regulatory Affairs. The search revealed no entity registered in the District of Columbia that used "GIRL FRIDAY" in its name.

98.     MGF Holdings, Ltd. is neither a domestic entity organized in the District of Columbia nor a foreign entity registered to transact business in the District of Columbia.

99.     MGF is neither a domestic entity organized in the District of Columbia nor a foreign entity registered to transact business in the District of Columbia.

100.    My Girl Friday, Inc. is neither a domestic entity organized in the District of Columbia nor a foreign entity registered to transact business in the District of Columbia.

101.    MY GIRL FRIDAY is neither a domestic entity organized in the District of Columbia nor a foreign entity registered to transact business in the District of Columbia.

102.    YGF provided services to customers in the District of Columbia beginning in April 2004. YGF began advertising its services in the District of Columbia in May 2004.

103.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised in *The Current*.

104.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised in the *Washington Post*.

105.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised in the *Washington Times*.

106.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised in *The Washingtonian*.

107.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised on any radio station that broadcasts in the District of Columbia.

108.    Between January 2003 and the present, the purported mark "MY GIRL FRIDAY" allegedly owned by MGF has not been advertised on any television station that broadcasts in the District of Columbia.

109.    Between January 2003 and the present, MGF has provided *de minimis*, if any, services under the purported mark "MY GIRL FRIDAY" in the District of Columbia.

110.    According to MGF Holdings, Ltd.'s audited financial statements, for the period June 15, 2004 to December 31, 2004, MGF Holdings, Ltd. (MGF's predecessor-in-interest) spent a total of $2,710 in advertising.

## CLAIMS FOR RELIEF

### COUNT ONE
### Declaratory Judgment
### (The Purported Mark is Generic)

111.    YGF incorporates paragraphs 1-110 of these Amended Counterclaims as if fully set forth herein.

112.    Pursuant to 28 U.S.C. § 2201, YGF seeks a declaration of its right to continue doing business in the Washington, D.C. metropolitan area (which includes the District of Columbia,

Maryland, and Virginia) as YOUR GIRL FRIDAY, LLC and a declaration that YGF is not infringing on any of MGF's alleged rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and not violating District of Columbia law.

113.    MGF alleges that it owns actionable proprietary rights in the purported service mark "MY GIRL FRIDAY."  YGF contends that MGF has no actionable propriety rights in "MY GIRL FRIDAY."

114.    Based on the parties' differing interpretations of the proprietary rights in "MY GIRL FRIDAY," YGF seeks a declaratory judgment that:

(a)    The purported service mark "MY GIRL FRIDAY" is generic.

(b)    MGF does not own any actionable proprietary rights to "MY GIRL FRIDAY" under the Lanham Act, 15 U.S.C. § 1051 *et seq.* or under District of Columbia law.

**COUNT TWO**
**Declaratory Judgment**
**(In the Alternative)**
**(The Purported Mark is Highly Descriptive with no Secondary Meaning)**

115.    YGF incorporates paragraphs 1-114 of these Amended Counterclaims as if fully set forth herein.

116.    Pursuant to 28 U.S.C. § 2201, YGF seeks a declaration of its right to continue doing business in the Washington, D.C. metropolitan area (which includes the District of Columbia, Maryland, and Virginia) as YOUR GIRL FRIDAY, LLC and a declaration that YGF is not infringing on any of MGF's alleged rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and not violating District of Columbia law.

117.    MGF alleges that (a) consumers have come to recognize MGF's service mark "MY GIRL FRIDAY" as identifying MGF and its concierge services, and (b) the "MY GIRL FRIDAY" service mark has become well and favorably known to the public.  YGF contends that, at best, "MY GIRL FRIDAY" is highly descriptive and has not acquired secondary meaning.

118.    Based on the parties' differing interpretations of the proprietary rights in "MY GIRL FRIDAY," YGF seeks a declaratory judgment that:

(a)    The purported service mark "MY GIRL FRIDAY" is highly descriptive.

(b)    The purported service mark "MY GIRL FRIDAY" has not acquired secondary meaning.

(c)    MGF does not own any actionable proprietary rights to "MY GIRL FRIDAY" under the Lanham Act, 15 U.S.C. § 1051 *et seq.* or under District of Columbia law.

**COUNT THREE**
**Declaratory Judgment**
**(In the Alternative)**
**(No Actual or Likely Confusion)**

119.    YGF incorporates paragraphs 1-118 of these Amended Counterclaims as if fully set forth herein.

120.    Pursuant to 28 U.S.C. § 2201, YGF seeks a declaration of its right to continue doing business in the Washington, D.C. metropolitan area (which includes the District of Columbia, Maryland, and Virginia) as YOUR GIRL FRIDAY, LLC and a declaration that YGF is not infringing on any of MGF's alleged rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and not violating District of Columbia law.

121.    MGF alleges that (a) "YOUR GIRL FRIDAY" is confusingly similar to "MY GIRL FRIDAY," and (b) YGF's use of "YOUR GIRL FRIDAY" in the District of Columbia is likely to cause confusion, mistake, and deception and to lead MGF's District of Columbia clients and potential clients of MGF's services into wrongly believing that YGF's services are authorized by, licensed by, sponsored by, related to, or otherwise associated with MGF. YGF contends that "YOUR GIRL FRIDAY" has not caused confusion, and is not likely to cause confusion, among consumers within the District of Columbia or to otherwise deceive District of Columbia consumers into believing that YGF is in any way affiliated with MGF.

122.    Based on the parties' differing interpretations of their rights, YGF seeks a declaratory judgment that:

(a)    Consumers in Washington, D.C. are not confused or deceived into believing that the purported mark "MY GIRL FRIDAY" is similar to "YOUR GIRL FRIDAY."

(b)    Consumers in Washington, D.C. are not likely to be confused or deceived into believing that the purported mark "MY GIRL FRIDAY" is similar to "YOUR GIRL FRIDAY."

(c)    There is a low, if any, degree of similarity between the purported mark "MY GIRL FRIDAY" and "YOUR GIRL FRIDAY."

(d)    YGF did not intend to adopt, and in fact did not adopt, the purported "MY GIRL FRIDAY" mark.

(e)    YGF's intent to use "YOUR GIRL FRIDAY" was to denote its services, and YGF has at all relevant times done so in good faith.

(f)    There is no evidence that any consumers in Washington, D.C. were actually confused into believing that "YOUR GIRL FRIDAY" was associated in any way with the purported mark "MY GIRL FRIDAY" or with MGF.

(g)    YGF does not use or market its services in the District of Columbia in a manner similar to MGF's alleged use or marketing of the purported mark "MY GIRL FRIDAY" in the District of Columbia.

(h)    Purchasers of "Girl Friday" services in the District of Columbia are likely to exercise care in choosing a provider of "Girl Friday" services and therefore are not likely to be confused into believing that "YOUR GIRL FRIDAY" was associated in any way with the purported mark "MY GIRL FRIDAY" or with MGF.

(i)    The purported mark "MY GIRL FRIDAY" is extremely weak.

## COUNT FOUR
### Declaratory Judgment
### (In the Alternative)
### (Fair Use)

123.    YGF incorporates paragraphs 1-122 of these Amended Counterclaims as if fully set forth herein.

124.    Pursuant to 28 U.S.C. § 2201, YGF seeks a declaration of its right to continue doing business in the Washington, D.C. metropolitan area (which includes the District of Columbia, Maryland, and Virginia) as YOUR GIRL FRIDAY, LLC and a declaration that YGF is not infringing on any of MGF's alleged rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and not violating District of Columbia law.

125.    MGF alleges that YGF's use of "YOUR GIRL FRIDAY" is not a fair use.  YGF contends that its use of "YOUR GIRL FRIDAY" is a fair use because YGF has always used that name to denote its services and, at all times relevant herein, has done so in good faith.

126.    Based on the parties' differing interpretations of their rights, YGF seeks a declaratory judgment that YGF is not liable under the Lanham Act, 15 U.S.C. § 1051 *et seq.* or District of Columbia law because YGF's use of "YOUR GIRL FRIDAY" is a fair use.

## COUNT FIVE
### Attorneys' Fees

127.    YGF incorporates paragraphs 1-126 of these Amended Counterclaims as if fully set forth herein.

128.    YGF is entitled to recover its reasonable attorneys' fees pursuant to section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), because this is an "exceptional case[]."

129.    MGF's lawsuit against YGF is oppressive and not supported by law or by facts that MGF knew, or in the exercise of reasonable diligence, should have known before initiating this litigation.

130.    MGF's lawsuit against YGF has been brought to harass, embarrass, and injure YGF, and to force YGF to spend thousands of dollars in attorneys' fees, expenses, and costs.

131.    MGF has perpetrated a fraud on this Court by making several false representations of fact to this Court and to YGF, as detailed in these Amended Counterclaims.

132.    MGF has intentionally and in bad faith breached a settlement agreement that was "binding" and "enforceable" and that required MGF to pay YGF $50,000.00.

133.    Rather than disclose to YGF that it was insolvent and judgment proof, MGF and Ms. Hagenmaier falsely represented that: it was an "extremely successful business" with a "growing network of franchisee[s]"; it "ha[d] deals that are worth $10 million, $20 million and $40 million on the table"; "the *My Girl Friday* brand is quickly becoming the leader in this emerging [national concierge service] industry"; and, "*My Girl Friday* is at the leading edge of a major growth industry."

134.    MGF hid its dire financial condition from YGF with the intent of causing YGF to incur additional attorneys' fees, costs, and expenses in connection with defending this litigation and with enforcing the settlement to which the parties had agreed.

135.    In fact, when MGF entered into the settlement, it neither had the funds nor the intention of performing its obligations under the agreement that MGF's counsel signed.  MGF waited almost two months before announcing its inability to pay the required $50,000.00 settlement knowing full well that YGF was incurring attorneys' fees, costs, and expenses to enforce the settlement.

136.    MGF's franchise business has failed and MGF is insolvent.

137.    MGF sold only 1 franchise since it first began offering "MY GIRL FRIDAY" franchises in July 2004, and that franchise has failed.

138.    MGF initiated this litigation against YGF to force YGF to become a "MY GIRL FRIDAY" franchisee and to pay MGF thousands of dollars in franchise fees and costs.

139.    MGF's lawsuit is baseless because MGF knows that the purported mark "MY GIRL FRIDAY" is generic or highly descriptive with no secondary meaning.

140.    MGF knowingly and intentionally omitted from its complaint against YGF well-known, publicly available facts that were in existence at the time MGF initiated litigation against YGF.

141.    The following facts, among others, bear directly on MGF's claims against YGF, but were knowingly and intentionally omitted from MGF's complaint:

(a)    MGF Holdings, Ltd., MGF's predecessor-in-interest, has a federal trademark application pending before the PTO, which seeks to register "MY GIRL FRIDAY" as a service mark.

(b)    The PTO has not published MGF Holdings, Ltd.'s application for opposition as of the date of this filing.

(c)    The PTO required MGF Holdings, Ltd. to include a disclaimer in its trademark application.

(d)    MGF Holdings, Ltd. agreed to include the following disclaimer in its trademark application:  "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'GIRL FRIDAY' APART FROM THE MARK AS SHOWN."

(e)    On or about March 14, 2005, MGF Holdings Ltd.'s current counsel asked the PTO to remove the disclaimer.

(f)    As of the date of this filing, the PTO has refused to remove the disclaimer.

142.    MGF omitted these well-known, material facts from its complaint against YGF to convey the false impression that the purported mark "MY GIRL FRIDAY" is not generic or is not an otherwise highly descriptive mark with no secondary meaning.

143.    MGF initiated this litigation against YGF to collaterally attack the disclaimer that is part of MGF Holdings Ltd.'s pending federal trademark application.

144.    MGF initiated this litigation to drain YGF's resources to the point that it no longer is able to defend itself in this Court, as evidenced by its bad faith breach of the settlement agreement.

145.    MGF initiated this litigation against YGF to ensure that YGF will not file with the PTO an opposition to MGF Holdings Ltd.'s pending trademark application.

146.    Prior to initiating this litigation, MGF stated that a YGF opposition to MGF Holdings Ltd.'s federal trademark application would be "frivolous" because YGF is a small company, not because such an opposition would lack merit.

147.    MGF has never had any reasonable grounds, after conducting the appropriate inquiry mandated by the Federal Rules of Civil Procedure, for making the following allegations in the underlying complaint against YGF:

(a)    "Since its inception, [MGF] has expanded from the Cincinnati, Ohio area into 64 other markets, including the Washington, D.C. metropolitan area."

(b)    "Through the hard work of Ms. Hagenmaier and MGF's other dedicated employees and contractors retained by MGF, as well as MGF's extensive promotion of its business, MGF has, in a short time, developed into an extremely successful business."

(c)    "By virtue of [MGF's] commercial success and promotion, consumers have come to recognize [MGF's] service mark 'MY GIRL FRIDAY' as identifying [MGF] and its concierge services, and as a result its 'MY GIRL FRIDAY' service mark has become well and favorably known to the public."

(d)     "Recently [MGF] learned that [YGF] was using the name 'YOUR GIRL FRIDAY' for the same type of concierge services as offered by [MGF] in the Washington, D.C. area."

(e)     "[YGF's] use of 'YOUR GIRL FRIDAY' for concierge services has caused and is likely to continue to cause confusion, mistake and deception, and to lead clients and potential clients of [MGF's] services into believing that [YGF's] services are authorized by, licensed by, sponsored by, related to, or otherwise associated with [MGF] when in fact they are not."

(f)     MGF "has been damaged and unless [YGF] is enjoined from further use of 'YOUR GIRL FRIDAY' and any other name confusingly similar to 'MY GIRL FRIDAY' for concierge services, the damage to [MGF], which is irreparable, will increase."

(g)     YGF's "unauthorized use of 'YOUR GIRL FRIDAY' as described herein is likely to cause confusion or misunderstanding as to the source, sponsorship, approval, or certification of the services that [YGF] provides."

(h)     YGF's "unauthorized use of 'YOUR GIRL FRIDAY' as described herein is likely to cause confusion and misunderstanding as to the affiliation, connection or association with, or certification by [MGF]."

(i)     "As a result of [YGF's] activities, [MGF] has been damaged and has suffered injury to their business reputation and good will."

148.     All of these allegations were false when made and MGF and Ms. Hagenmaier knew that they were false. MGF has exhibited a reckless disregard for the truth and has ignored publicly available evidence, including statements binding on MGF, that contradict the allegations made against YGF, including, but not limited to, the allegations recited in paragraphs 147(a)-(i) of these Amended Counterclaims.

## COUNT SIX
### Unfair Competition

149.    YGF incorporates paragraphs 1-148 of these Amended Counterclaims as if fully set forth herein.

150.    MGF has engaged in unfair competition.

151.    MGF has knowingly and intentionally sought to monopolize the common phrase "GIRL FRIDAY."

152.    MGF's acts of unfair competition and monopolistic practices have caused YGF damages in an amount to be proven at trial.

153.    MGF has engaged in a pattern and practice of unfair competition with regard to the purported mark "MY GIRL FRIDAY."

154.    YGF is entitled to punitive damages to punish and deter MGF from engaging in similar acts of unfair competition in the future.

## COUNT SEVEN
### Abuse of Process

155.    YGF incorporates paragraphs 1-154 of these Amended Counterclaims as if fully set forth herein.

156.    When MGF initiated this litigation, it never intended to pursue it and did not have sufficient resources to do so.

157.    MGF initiated this litigation for the improper purpose of attempting to force YGF to go into business with MGF.

158.    MGF caused the Court to dismiss this case without prejudice pending consummation of a settlement that MGF never intended to consummate.

159.     As a proximate result of MGF's abuse of the processes of this Court, YGF has suffered considerable damage in the form of attorneys' fees, costs, expenses, lost profits, and other damages in an amount to be proven at trial.

## COUNT EIGHT
### Breach of Contract

160.     YGF incorporates paragraphs 1-159 of these Amended Counterclaims as if fully set forth herein.

161.     MGF entered into a "binding" and "enforceable" settlement that required it to pay YGF $50,000.00.

162.     MGF has stated that it cannot pay the $50,000.00 settlement amount and has conceded in filings with the Court that it has breached the parties' agreement.

163.     MGF therefore is liable to YGF in the amount of $50,000.00, plus reasonable attorneys' fees, costs, and expenses, as allowed by Paragraph 8 of the letter agreement.

## COUNT NINE
### Promissory Estoppel
### (In the Alternative)

164.     YGF incorporates paragraphs 1-163 of these Amended Counterclaims as if fully set forth herein.

165.     If the Court concludes, contrary to the plain language of the letter agreement, that the agreement is not binding and enforceable, YGF asserts this alternative claim under the doctrine of promissory estoppel.

166.     MGF made a promise to YGF that it would pay YGF $50,000.00 to settle this matter.

167.     MGF intended to induce YGF to rely on that promise, and YGF did so.

168.     YGF relied on MGF's (false) promise to its detriment because MGF has failed to adhere to its promise to pay YGF $50,000.00.

169.    As a proximate result of MGF's breach of its promises, YGF has suffered considerable damage in the form of attorneys' fees, costs, expenses, lost profits, and other damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendant-Counterplaintiff YGF prays that, upon final judgment, it has judgment as follows:

1.    Dismissing with prejudice MGF's complaint against YGF.

2.    A declaration that

   (a)    YGF is not infringing on any alleged proprietary rights of MGF.

   (b)    The purported service mark "MY GIRL FRIDAY" is generic and that MGF therefore has no proprietary rights in "MY GIRL FRIDAY" under the Lanham Act or District of Columbia law.

   (c)    In the alternative, the purported service mark "MY GIRL FRIDAY" is highly descriptive with no secondary meaning and that MGF therefore has no proprietary rights in "MY GIRL FRIDAY" under the Lanham Act or District of Columbia law.

   (d)    In the alternative, "YOUR GIRL FRIDAY" is not confusing, and it is not likely to be confusingly similar, to the purported mark "MY GIRL FRIDAY."

   (e)    In the alternative, YGF's use of "YOUR GIRL FRIDAY" is a fair use.

3.    Against MGF for YGF's reasonable attorneys' fees and expenses incurred in the prosecution and defense of this case and on appeal, if necessary.

4.    Against MGF for all costs of Court.

5.    Against MGF for punitive damages in the amount of $1,000,000.00.

6.      Against MGF for prejudgment and post-judgment interest.

7.      Against MGF for all other and further relief, both at law and in equity, to which YGF may show itself justly entitled.

## <u>DEMAND FOR A JURY TRIAL</u>

YGF demands a jury trial on all issues so triable.


Dated: December 22, 2005               Respectfully submitted,
       Washington, D.C.

                                            /s/_____
                                            Ugo Colella (D.C. Bar No. 473348)
                                            Deborah M. Lodge (D.C. Bar No. 393942)
                                            PATTON BOGGS LLP
                                            2550 M Street, N.W.
                                            Washington, D.C. 20037
                                            Phone: (202) 457-5693
                                            Fax:    (202) 457-6315

                                            *Attorneys for Defendant-Counterplaintiff*
                                            *Your Girl Friday, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2005, a copy of the foregoing Amended Counterclaims of Defendant-Counterplaintiff Your Girl Friday, LLC was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/
Ugo Colella